900 P.2d 161 (1995)
79 Hawai`i 154
UNIVERSITY OF HAWAI`I PROFESSIONAL ASSEMBLY, Appellant-Appellant,
v.
Bert M. TOMASU, Russell T. Higa, Sandra H. Ebesu,[1] members of the Hawai`i Labor Relations Board, and Board of Regents, University of Hawai`i, Appellees-Appellees.
No. 15119.
Supreme Court of Hawai`i.
July 21, 1995.
*162 T. Anthony Gill (Wade C. Zukeran, with him on the briefs, of Gill, Park, Park & Kim), Honolulu, for appellant-appellant University of Hawai`i Professional Assembly.
Valri Lei Kunimoto (David T. Ishikawa, with her on the briefs) Honolulu, for appellees-appellees Bert M. Tomasu, Russell T. Higa, and Sandra H. Ebesu, Members of the Hawai`i Labor Relations Bd.
Elton K. Suzuki (Ruth I. Tsujimura and Colette H. Gomoto, on the briefs), Deputy Attys. Gen., Honolulu, for appellee-appellee Bd. of Regents, University of Hawai`i.
Before LUM, C.J.,[2] WAKATSUKI,[3] MOON and LEVINSON, JJ., and BURNS, Intermediate Court of Appeals Chief Judge, in place of KLEIN, J., recused.
MOON, Chief Justice.[4]
Appellant University of Hawai`i Professional Assembly (UHPA) appeals from the decision of the First Circuit Court affirming the Hawai`i Labor Relations Board's (HLRB) ruling in favor of appellee Board of Regents, University of Hawai`i (BOR) in a labor dispute over the BOR's promulgation and distribution of a policy statement in accordance with the Drug-Free Workplace Act (DFWA or the Act), 41 U.S.C. §§ 701-707 (1988); 15 U.S.C. § 634(b)(6) (1988). Because the policy statement will affect topics subject to mandatory bargaining, and the DWFA mandates not only promulgation, but also active implementation of the policy statement, the UHPA asserts that the BOR should be compelled to bargain with the UHPA upon demand. The HLRB and the BOR argue that the promulgated policy statement merely complies with federal law, and, as the BOR has not yet attempted to implement the policy statement, the time for bargaining has not arisen.
The circuit court affirmed the HLRB's decision that: (1) because the policy statement *163 merely complies with federal law, its initial promulgation is not bargainable; and (2) the UHPA must wait until the BOR attempts actual implementation of an apparatus to effectuate the policy statement before the UHPA can demand bargaining on bargainable topics. For the reasons discussed below, we affirm part (1) above and reverse part(2).

I. BACKGROUND

On November 18, 1988, the DFWA was signed into law as part of the omnibus anti-drug legislation passed by Congress. The DFWA requires employers who are the recipients of federal grants or contracts to maintain drug-free workplaces by establishing policies on drug awareness and implementing them in the workforce. Specifically, the DFWA requires, inter alia, that an employer, contracting with the federal government or receiving federal grants, certify compliance with the Act by publishing a statement notifying its employees that the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited in the employer's workplace and specifying the actions that will be taken against employees for violations of such prohibitions. 41 U.S.C. §§ 701(a)(1)(A) and 702(a)(1)(A). If an employee is convicted of violating a criminal drug statute, the DFWA also requires the employer to impose sanctions on, or to require the satisfactory participation in a drug abuse assistance or rehabilitation program by, such employee. 41 U.S.C. § 703. The DFWA further provides that continued payments on contracts with the federal government, or continued federal funding to the grantee, is contingent upon compliance with the Act. 41 U.S.C. §§ 701(a)(2), 701(b)(1), 701(a)(2), and 702(b)(1). The DFWA took effect on March 18, 1989.
In July 1988, the President of the University of Hawai`i notified the UHPA that a task force had been organized to formulate an anti-drug policy covering students, faculty, and staff at the University of Hawai`i. The President first sent a draft of the policy statement, outlining the requirements of the Act to the UHPA and, on February 13, 1989, sent a revised draft of the policy statement to the UHPA. The UHPA's Executive Director acknowledged that he had received the draft of the policy statement for consultation and comment.
On March 30, 1989, after the policy statement was finalized, the University's Vice-President for Research and the University's Director of Personnel both sent a memorandum to all chancellors, deans, and directors requesting their compliance with the policy statement. On May 9, 1989, the UHPA's Executive Director sent a letter to the University's Director of Personnel demanding that the University bargain over implementation of the policy statement. The Executive Director renewed this demand on May 12, 1989, whereupon the Director of Personnel replied that the policy statement was not a bargainable subject.
The UHPA subsequently filed prohibited practice charges under Hawai`i Revised Statutes (HRS) § 89-13(a)(5) (1985)[5] against the BOR with the HLRB on May 15, 1989, alleging that the policy statement affected topics subject to mandatory bargaining and that the BOR's refusal to bargain constituted an unfair labor practice. The HLRB ruled that the policy statement was not bargainable because it merely complied with a federal statute and the BOR had not yet attempted to implement the policy statement.
The HLRB held that, although the DFWA requires an employer receiving federal funding to institute various apparatuses to administer procedures related to the implementation of policies mandated by the DFWA, and the DFWA provides the employer with a range of options during implementation, the mere promulgation and distribution of a policy statement in compliance with the DFWA does not trigger the BOR's duty to bargain. See In the Matter of University of Hawai`i Professional Assembly and Board of Regents, University of Hawai`i, Decision No. *164 303, 4 HLRB 689 (1990) [hereinafter, Decision 303]. The HLRB explicitly noted, however, that "actual implementation of the apparatus required for the execution of the mandates of the DFWA, as opposed to the mere publishing or promulgation of those mandates in policy statements, may give rise to the duty to bargain." Id. at 712. On appeal, the circuit court affirmed the HLRB's findings of fact and conclusions of law. This appeal timely followed.

II. STANDARD OF REVIEW

In Sussel v. Civil Service Commission, 74 Haw. 599, 851 P.2d 311, reconsideration denied, 74 Haw. 650, 857 P.2d 600 (1993), we stated:
Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court
must determine whether the [circuit] court was right or wrong in its decision, applying the standards set forth in HRS. § 91-14(g) to the agency's decision. [This court's] review is further qualified by the principle that the [agency's] decision carries a presumption of validity and [a]ppellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.
HRS § 91-14(g) (1985) provides:
Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of this agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
HRS § 91-14(g) (1985).
Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of its discretion under subsection (6). Accordingly, a reviewing court will reverse an agency's finding of fact if it concludes that such agency finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91-14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable.
Id. at 608-10, 851 P.2d at 316-17 (citations omitted) (brackets in original).

III. DISCUSSION

A. Compliance With Federal Law, the Employer's Discretion, and the Duty to Bargain

The UHPA contends that the HLRB erred because the UHPA is entitled to compel the BOR to bargain prior to the BOR's attempt to implement the policy statement. On the other hand, the HLRB and the BOR argue that, because the policy statement merely complies with a mandatory federal statute, and the BOR has not attempted to implement the apparatus of the policy statement, the need for bargaining has not yet arisen.
Both the BOR and the UHPA claim that In the Matter of the Hawaii Fire Fighters Association, Local 1463 and Ariyoshi, Decision No. 242, 4 HLRB 164 (1987), supports their respective positions. In Hawaii Fire Fighters, the HLRB mandated bargaining on the implementation of the wage statutes of the Fair Labor Standards Act because the implementation of the federal statute went beyond mere compliance and allowed the employer some discretion in its implementation. Analyzing federal law, the HLRB concluded that unilateral changes made in a collective bargaining agreement are permissible only when the changes are essential in order to comply with federal law. The HLRB noted:

*165 Cases make clear that compliance with Federal statutes as such is not a negotiable issue, but cases implicitly recognize a distinction between negotiation over compliance and negotiation over implementation of federal statutes. Based on this distinction, it appears that though compliance is not negotiable, where the employer has discretion under federal law, regulation, or administrative opinions in implementing federal law, the duty to bargain applies.
Id. at 194 (underscoring in original) (bold emphasis added). Under Hawaii Fire Fighters, "the duty to bargain does not apply only in regard to changes in wages, hours, and working conditions which are essential for federal compliance, where no discretion, choice, or latitude for departure is allowed for the employer." Id. at 198 (emphasis in original). However, "[w]here such discretion, choice, or latitude is reasonably apparent, the duty to bargain over such issues of wages, hours, and working conditions affected in the process of implementation of federal mandates applies." Id.; see also In the Matter of the State of Hawai`i Organization of Police Officers (SHOPO) and Maui Police Department, County of Maui, Decision No. 333, 5 HLRB 146, 150 (1993) (all matters affecting wages, hours, and working conditions are negotiable and bargainable, subject only to the limitations in HRS § 89-9(d).) The HLRB in Hawaii Fire Fighters therefore concluded that "the compliance process must include an examination of the possibility for discretionary action. Once this is determined,... the duty to bargain is waived in regard to changes essential to or mandated by federal provisions, but ... the duty to bargain applies where there are alternative means of compliance." Id. at 197 (emphasis in original).
In the present case, the HLRB argues that it did not allow bargaining on the basis of the policy statement because the statement principally consists of terms mandated by a federal statute, and therefore the statement is merely a product of compliance with federal law. The BOR and the HLRB assert that, because the policy statement simply expresses the aspirational mission and goals of the university, and the university has not yet initiated any action to realize the goals expressed in the policy statement, the HLRB preserved the union's right to bargain until the BOR attempted to implement the apparatus that would effectuate the policy statement.
The UHPA contends that, in addition to the instances in which the policy statement oversteps the DFWA's mandates, the discretion inherent in the BOR's implementation of the policy statement is analogous to the discretion that the employer was able to exercise in Hawaii Fire Fighters, (that is, of choosing required hour changes, etc., which it was required to do in implementing the federal statute), and therefore triggers the duty to bargain. Consequently, resolution of this issue depends on whether the DFWA affords the BOR any discretion, choice, or alternative means of compliance with its terms.
In Decision 303, the HLRB explicitly acknowledged that the DFWA itself affords the employer a "range of implementation" in effectuating the provisions of the DFWA:
UHPA argues that such details as the range of discipline which can be applied, and when; the manner of notification of the employer; the types and costs and timing of rehabilitation which can be required; and the integration of compliance procedures with the rest of the contract subjects mentioned in the Executive Policyshould be open to negotiation. While such topics do require that the Employer herein institute various apparatus[es] to administer related procedures, the mere promulgation of policies providing for procedures mandated by federal law does not require negotiation. The range of implementation is built into the federal statute itself. The promulgation in the Executive Policy of the mandate which itself contains the range of choices does not give rise to the duty to negotiate.
However, the Board recognizes that as the apparatus making the DFWA functional at the University is established, the various provisions for implementation, including those over which negotiations are now sought by UHPA, will be subject to *166 consultation or negotiation, as the case may be, in particular instances.
Decision 303, 4 HLRB at 710 (emphasis added). This "range of implementation built into" the DFWA affords employers receiving federal funds discretion in implementing the provisions of the DFWA.
For example, the relevant portions of section 702(a)(1) of the DFWA provide:
(a) Drug-free workplace requirement
(1) Persons other than individuals
No person, other than an individual, shall receive a grant from any Federal agency unless such person has certified to the granting agency that it will provide a drug-free workplace by
. . . .
(F) imposing a sanction on, or requiring the satisfactory participation in a drug abuse assistance or rehabilitation program by, any employee who is so [convicted of any criminal drug statute violation], as required by section 703 of this title.
41 U.S.C. § 702(a)(1). Section 703 of the DFWA provides:
Employee sanctions and remedies
A grantee or contractor shall, within 30 days after receiving notice from an employee of a conviction pursuant to section 701(a)(1)(D)(ii) or 702(a)(1)(D)(ii) of this title
(1) take appropriate personnel action against such employee up to and including termination; or
(2) require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency.
41 U.S.C. § 703. As is evident from the language of the above-quoted sections of the DFWA, the BOR has discretion to choose alternative means of compliance with the employee sanction requirements of the Act. Although the DFWA requires the BOR, upon receiving notice, of an employee's criminal drug conviction, to take action against the employee, the DFWA provides the BOR with a choice of either imposing progressive disciplinary action or requiring that the employee participate in a drug abuse assistance or rehabilitation program. Thus, pursuant to Hawaii Fire Fighters, the duty to bargain ostensibly applies to the BOR's implementation of the DFWA's sanction provisions.

B. When The Duty to Bargain Arises

Whether the UHPA is entitled to demand bargaining over the implementation of the policy statement, however, also depends on when the duty to bargain arises. The duty to bargain arises in two circumstances potentially applicable to this decision: First, the obligation to bargain collectively forbids unilateral action by the employer with respect to pay rates, wages, hours of employment, or other conditions of employment during the term of a labor contract, even if the action is taken in good faith. It is well established that an employer's unilateral action in altering the terms and conditions of employment, without first giving notice to and conferring in good faith with the union constitutes an unlawful refusal to bargain. See, e.g., NLRB v. Katz, 369 U.S. 736, 737, 82 S.Ct. 1107, 1108, 8 L.Ed.2d 230 (1962) (unilateral implementation of automatic wage increases, changes in sick-leave benefits and numerous merit increases violated the statutorily imposed duty to bargain collectively); Burlington Fire Fighters Ass'n v. City of Burlington, 142 Vt. 434, 457 A.2d 642 (1983) (principle that unilateral imposition of terms of employment is a violation of duty to bargain is equally applicable to public sector bargaining); First Nat'l Maint. Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). Therefore, when the employer attempts to promulgate a policy that will affect bargainable topics, the employer cannot do so without first initiating bargaining on such topics.
Second, the duty to bargain also arises if a union unilaterally demands "midterm" bargaining, that is, bargaining midway through an active applicable collective bargaining agreement on bargainable subjects such as wages, hours, or terms of employment. In National Treasury Employees Union v. Federal Labor Relations Authority, 810 F.2d 295 (D.C.Cir.1987), the United *167 States Court of Appeals for the District of Columbia Circuit examined a request to bargain made under the auspices of the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 701-7135 (1982 & Supp. II 1984), which dictates the scope of the employer's duty to bargain in the public sector. In National Treasury, the union made a written request to bargain with respect to certain conditions of employment, such as the use of government cars, permission to work at home, and worksite selection. The employer contended that it had no duty to bargain because the agency had made no changes in the areas covered by the proposals. The employer asserted that the duty to bargain midway through a collective bargaining agreement arises only when the agency proposes changes.
The National Treasury court examined the employer's duty to bargain in light of labor relations statutes enacted by Congress, the legislative intent behind the statutes, general principles of labor law, and analogous statutes within private sector labor law, all of which displayed a long-established precedent that the duty to bargain extended to midterm proposals initiated by either management or labor, provided that the proposals do not conflict with the existing agreement. See, e.g., NLRB v. Jacobs Mfg. Co., 196 F.2d 680, 684 (2d Cir.1952). Taking these considerations into account and recognizing the statutory goal of "equalizing the positions of labor and management at the bargaining table," the National Treasury court stated:
There is nothing inherently threatening to management prerogatives, however, in allowing midterm bargaining by the union. To allow management to retain the right to raise new issues, but to deny that right to the employees' representatives would produce an inequality in bargaining power without express statutory support or strong policy justification. To limit the right of the union in midterm bargaining would provide management with an unwarranted advantage which would violate a guiding purpose of the statute.
810 F.2d at 301; see also NLRB v. American Nat'l Can Co., Foster-Forbes Glass Div., 924 F.2d 518, 523 (4th Cir.1991) (duty to bargain extends beyond the period of contract negotiations to the arena of labor-management relations during the term of a collective bargaining agreement).
Consistent with the above theories, the BOR cannot unilaterally implement policies that affect bargainable topics (such as wages, hours, or terms of employment), and the UHPA should be able to demand bargaining midterm on topics subject to mandatory bargaining. Thus, in combination with the principles discussed by the HLRB in Hawaii Fire Fighters, the duty to bargain applies upon issuance of the policy statement if the topics covered in the statement over which the BOR is afforded discretion by the DFWA are subject to mandatory bargaining.

C. The Terms of the Policy Statement Affect Bargainable Topics

HRS § 89-9 sets out the scope of topics subject to mandatory bargaining. However, section 89-9 contains two subsections that, if read disjunctively, would either grant unlimited discretion to the managerial functions of the employer, see HRS § 89-9(d),[6] or would allow management and employees *168 to submit all aspects of work to the bargaining table. See HRS § 89-9(a).[7] In In the Matter of the Hawaii State Teachers Association and the Department of Education, Decision No. 22, 1 HPERB 251 (1972) [hereinafter, HSTA], the HLRB wrestled with this dilemma within the purview of the legislative intent underlying section 89-9. The HLRB noted that the legislature, through its "Statement of Findings and Policy," recognized joint decisionmaking as leading to a more responsive workforce and a more effective government. HRS § 89-1.[8]
In light of the legislative policy, the HLRB in HSTA noted:
Section 89-9(a), (c) and (d) must be considered in relationship to each other in determining the scope of bargaining. For if Section 89-9(a) were considered disjunctively, on the one hand, all matters affecting the terms and conditions of employment would be referred to the bargaining table, regardless of employer rights. On the other hand, Section 89-9(d), viewed in isolation, would preclude nearly every matter affecting terms and conditions of employment from the scope of bargaining. Surely, neither interpretation was intended by the Legislature.
Bearing in mind that the Legislature intended Chapter 89 to be a positive piece of legislation establishing guidelines for joint-decision making over matters of wages, hours and working conditions, we are of the opinion that all matters affecting wages, hours and working conditions are negotiable and bargainable, subject only to the limitations set forth in Section 89-9(d).

Id. at 266 (emphasis added). In the present case, the BOR asserts that because it has not yet attempted to implement the apparatus to effectuate the policy statement, the policy statement alone does not have an effect on wages, hours, or working conditions and *169 therefore is not subject to the duty to bargain. We disagree.
The DFWA does not merely mandate a policy statement setting forth the goals of the university; it also requires implementation. In an analogous situation, in Wilder v. Virginia Hospital Association, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the United States Supreme Court considered whether a private right of action inhered in the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A). The Wilder Court noted that, in order for a private right of action to exist, the act must be written in mandatory terms. 496 U.S. at 512-13, 110 S.Ct. at 2519. The Court further noted that the Medicaid Act, 79 Stat. 343, as amended, 42 U.S.C. §§ 1396a-1396v (1982 ed. and Supp. V), predicated the future disbursement of federal funds upon state compliance with the terms of the Medicaid Act, thereby rendering it mandatory. Id. at 512, 110 S.Ct. at 2519. As to what constituted compliance with the Medicaid Act, the Wilder Court noted:
Petitioners concede that the Boren Amendment requires a State to provide some level of reimbursement to health care providers and that a cause of action would lie under § 1983 if a State failed to adopt any reimbursement provision whatsoever.... Petitioners also concede, as they must, that a State is required to find that its rates are reasonable and adequate and to make assurances to that effect to the Secretary.... Any argument that the requirements of findings and assurances are procedural requirements only and do not require the State to adopt rates that are actually reasonable and adequate is nothing more than an argument that the State's findings and assurances need not be correct.
We reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless. It would make little sense for Congress to require a State to make findings without requiring those findings to be correct.
. . . .
Rather, the only plausible interpretation of the Amendment is that by requiring a State to find that its rates are reasonable and adequate, the statute impose the concomitant obligation to adopt reasonable and adequate rates.
496 U.S. at 512-15, 110 S.Ct. at 2519-21 (underscording in original) (bold emphases added). Therefore, under Wilder, when Congress passes a statute, mere promulgation of assurances of compliance (e.g., by stating, as in Wilder, that its medicare rates are reasonable), does not constitute compliance with the federal statute. Compliance with the federal statute in Wilder was achieved only by the actual provision of reasonable and adequate rates.
In the present case, the DFWA, like the Boren Amendment in Wilder, contains mandatory language that predicates continued federal funding upon state agencies' compliance with the terms of the Act. Consistent with the reasoning set forth in Wilder, it is illogical to assert that, when Congress enacted the DFWA, it intended that an employer would only have to promulgate a policy statement that reiterated the goals of the Act, without initiating action in accordance with those goals. The UHPA correctly notes, and the BOR does not dispute, that implementation of the policy statement will necessarily involve topics of mandatory bargaining, such as what the mandatory drug treatment program will entail, where the employees will go for treatment, and how the treatment programs will be funded. Because the DFWA not only requires promulgation of policies in compliance with the DFWA, but requires action as well, implementation of the policy must necessarily have some effect on wages, hours, or terms and conditions of employment.
For example, as previously noted, the DFWA mandates that, when an employee violates the drug enforcement policy, the employee must be duly sanctioned or must participate in a drug abuse assistance or rehabilitation program. The DFWA does not describe the exact procedure for these actions, leaving these details to the individual employers to fashion and implement. Yet, it is apparent that, under current law, mere promulgation *170 of a policy that proclaims compliance with a federal statute will not constitute compliance with that statute, see Wilder, 496 U.S. at 513-14, 110 S.Ct. at 2519-20; active implementation of the policy is also required. This places the employee in an awkward position. The employee knows that certain actions will result in discipline because the federal statute mandates discipline, but the employee does not know what form the discipline will take because the policy statement has yet to be implemented by the employer. Thus, the employee clearly is subject to some form of disciplinary action, which definitely affects terms of employment and working conditions subject to mandatory bargaining under HRS § 89-9(a). However, even if we were to accept the position of the HLRB and the BOR, the employee paradoxically could not request bargaining until the employer attempts to implement the policy, or until the employer actually takes the disciplinary action against the employee.
We therefore hold that, to the extent that the policy statement constitutes compliance with the DFWA, it is not bargainable. However, we also hold that, because the DFWA inherently mandates implementation, the UHPA need not wait until the BOR attempts an implementation of an apparatus to effectuate the policy. Because implementation will affect bargainable topics, the UHPA may initiate bargaining at any time upon such topics. Thus, the BOR's duty to bargain with the UHPA is triggered by the UHPA's demand.

IV. CONCLUSION

For the foregoing reasons, we affirm the circuit court's affirmance of the HLRB's decision that, because the policy statement merely complies with the federal law, its initial promulgation is not bargainable. We reverse, however, the circuit court's affirmance of the HLRB's ruling that the UHPA must wait until the BOR attempts actual implementation of the apparatus to effectuate the policy statement before it can demand bargaining on bargainable topics potentially affected by the DFWA.
NOTES
[1] This action was initially commenced against Gerald K. Machida as a member of the Hawai`i Labor Relations Board (HLRB). Sandra H. Ebesu has since replaced Machida as a member of the HLRB, and Ebesu has been substituted automatically for Machida as a party to this action pursuant to Hawai`i Rules of Appellate Procedure Rule 43(c)(1).
[2] Chief Justice Lum, who heard oral argument in this case, retired from the bench on March 31 1993. See Hawai`i Revised Statutes (HRS) § 602-10 (1985).
[3] Justice Wakatsuki, who heard oral arguments in this case, passed away on September 22, 1992. See HRS § 602-10.
[4] Associate Justice Moon, who heard oral argument in this case, was sworn-in as Chief Justice of the Supreme Court of Hawai`i on March 31, 1993.
[5] HRS § 89-13(a)(5) (1985) provides:

It shall be a prohibited practice for a public employer or its designated representative wilfully to:
. . . .
(5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89-9[.]
[6] HRS § 89-9(d) (1985) provides:

Scope of negotiations. Excluded from the subjects of negotiations are matters of classification and reclassification, benefits of but not contributions to the Hawaii public employees health fund, retirement benefits, and the salary ranges and the number of incremental and longevity steps now provided by law; provided that the number of steps in accordance with section 77-13.5, the amount of wages to be paid in each range and step, and the length of service necessary for the incremental and longevity steps shall be negotiable. Effective July 1, 1976, an employee shall not be entitled to the employee's normal annual increment or longevity increase, as the case may be, in any fiscal year that a negotiated pay increase is effected, whether by statute or agreement, and no part of such a fiscal year shall be counted as service creditable for any future increment or longevity pay increase. The employer and the exclusive representative shall not agree to any proposal which would be inconsistent with merit principles or the principle of equal pay for equal work pursuant to sections 76-1, 76-2, 77-31, and 77-33, which would be inconsistent with section 77-13.5, relating to the conversion to appropriate salary ranges, or which would interfere with the rights of a public employer to (1) direct employees; (2) determine qualification, standards for work, the nature and contents of examinations, hire, promote, transfer, assign, and retain employees in positions and suspend, demote, discharge, or take other disciplinary action against employees for proper cause; (3) relieve an employee from duties because of lack of work or other legitimate reason; (4) maintain efficiency of government operations; (5) determine methods, means, and personnel by which the employer's operations are to be conducted; and take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.
[7] HRS § 89-9(a) (1985) provides:

The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budgetmaking process, and shall negotiate in good faith with respect to wages, hours, the amounts of contributions by the State and respective counties to the Hawaii public employees health fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement, or any question arising thereunder, but such obligation does not compel either party to agree to a proposal or make a concession.
[8] HRS § 89-1 (1985) provides:

Statement of findings and policy. The legislature finds that joint decisionmaking is the modern way of administering government. Where public employees have been granted the right to share in the decisionmaking process affecting wages and working conditions, they have become more responsive and better able to exchange ideas and information on operations with their administrators. Accordingly, government is made more effective. The legislature further finds that the enactment of positive legislation establishing guidelines for public employment relations is the best way to harness and direct the energies of public employees eager to have a voice in determining their conditions of work, to provide a rational method for dealing with disputes and work stoppages, and to maintain a favorable political and social environment.
The legislature declares that it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government. These policies are best effectuated by (1) recognizing the right of public employees to organize for the purpose of collective bargaining, (2) requiring the public employers to negotiate with and enter into written agreements with exclusive representatives on matters of wages, hours, and other conditions of employment, while, at the same time, (3) maintaining merit principles and the principle of equal pay for equal work among state and county employees pursuant to section 76-1, 76-2, 77-31, and 77-33, and (4) creating a labor relations board to administer the provisions of chapters 89 and 377.