105 P.3d 236

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO, Complainant–Appellee/Cross–Appellant,

v.

Mufi HANNEMAN, Mayor, City and County of Honolulu; Kenneth Nakamatsu, Director, Department of Human Resources, City and County of Honolulu; and Frank Doyle, Refuse Collection and Disposal Division Chief, Department of Environmental Services, City and County of Honolulu, Respondents–Appellants/Cross–Appellees,

and

Hawai'i Labor Relations Board; Brian K. Nakamura, Chairperson; Chester C. Kunitake and Kathleen Racuya–Markrich, Board Members, Agency–Appellees/Cross–Appellees.

No. 25442.

Supreme Court of Hawai'i.

Jan. 28, 2005.

Paul T. Tsukiyama and Paul K.W. Au, Deputies Corporation Counsel, on the briefs, for respondents-appellants/ cross-appellees.

Herbert R. Takahashi, Honolulu, (of Takahashi, Masui, & Vasconcellos), on the briefs, for complainant-appellee/cross-appellant UPW.

Valri Lei Kunimoto, Honolulu, on the briefs, for agency-appellees/cross-appellees HLRB, joining in UPW's answering brief.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

Respondents-appellants/cross-appellees Mufi Hanneman, Mayor of the City and County of Honolulu; Kenneth Nakamatsu, Director of the Department of Human Resources for the City and County of Honolulu; and Frank Doyle, Refuse Collection and Disposal Division Chief of the Department of Environmental Services for the City and County of Honolulu [1] [collectively, the City], appeal from the first circuit court's October 4, 2002 final judgment, affirming agency-appellee/cross-appellee the Hawai'i Labor Relations Board's (HLRB) Decision No. 433 [hereinafter, HLRB's order].[2] On appeal, the City argues that the circuit court erred in failing to overturn the HLRB's order because the HLRB (1) committed an error of law in concluding that employee transfers are subject to collective bargaining under Hawai'i Revised Statutes (HRS) § 89–9(a) and (2) misapplied the terms of an addendum to complainant-appellee/cross-appellant United Public Workers, AFSCME, Local 646, AFL–CIO's (UPW)[3] collective bargaining agreement (CBA) with the City. Inasmuch as the first issue is dispositive of this appeal, we do not address the City's second contention.

For the following reasons, we reverse the October 4, 2002 judgment.

## I. BACKGROUND

Briefly stated, the instant case arises from a dispute between the City and UPW regarding the City's proposal to unilaterally transfer ten manual refuse collection workers from its Pearl City baseyard to the Honolulu baseyard due to a workforce deficiency in Honolulu and a surplus of collectors in Pearl City. UPW complained to the HLRB, asserting that the City committed a prohibited practice by failing to negotiate the transfers. The HLRB agreed, ruling that the City's transfer of workers was subject to collective bargaining.

### A. Factual Background

**1. Manual Refuse Collection in the City and County of Honolulu: "Uku Pau"**

Prior to the 1990s, all refuse collection in the City and County of Honolulu was performed manually through what is referred to as the "uku pau" system. Under the uku pau system, "a certain quantum of work is determined and designated as the equivalent of an 8–hour day's work, which can be completed at the will and pace of each work crew." In other words, all refuse crews worked at their own pace, were free to leave when their assignments were completed, and

---

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c) (2004), Mufi Hanneman and Kenneth Nakamatsu were substituted as parties to the instant appeal.

2. Judgment was entered by the Honorable Sabrina S. McKenna.

3. We note that UPW dismissed its cross appeal with prejudice via stipulation filed on March 4, 2003.

were not subject to the eight-hour work day applicable to other civil servants.

In 1973, the City and UPW codified the policies for the uku pau system in a written task work agreement (TWA) entitled "Policies and Procedures on Task Work for Refuse Collection." Section 11 of the TWA sets forth the "route policy" for the uku pau system and states in pertinent part:

A. The home collection and delivery to designated disposal sites of not more than 24,000 lbs. of refuse on the first day pickup of a route by each refuse collection crew shall be recognized as the work standard or task day, and shall be the basis on which routes shall be aligned under existing operations.

. . . .

H. *There will be no layoffs, transfers out of yards or Division, or change in pay status as a result of initiating this route policy; however, subsequent changes may be made pursuant to applicable rules and policies.*[4]

(Emphasis added.) In 1989 and thereafter, the City agreed to expressly incorporate the TWA into the CBA under section 51.04.

### 2. Automated Refuse Collection

In the 1990s, the City proposed an automated refuse collection system (ARCS) in an effort to modernize refuse operations on Oʻahu. As a result, on July 1, 1991, the City and UPW entered into a memorandum of agreement (MOA) in which they agreed to test and evaluate the ARCS through a one-year demonstration project, which was to expire on June 30, 1992. Under the MOA, ARCS trucks—each operated by a single employee as opposed to the standard three—would service various areas throughout Leeward Oahu. On May 19, 1993, the project was extended by agreement to expire on June 30,

1994.[5] Because of the concern that use of ARCS trucks might result in layoffs, the parties agreed that there would be no reduction in refuse collection staff as a result of continuing the ARCS project. However, the parties also specified in the MOA that, "[s]hould the need for reassignment or transfer of existing staff occur, such reassignment or transfer shall be determined on the basis of seniority."[6]

On June 16, 1994, the City and UPW entered into another MOA, converting two routes in the ARCS demonstration project into a permanent operation. This MOA embodied the first phase of the conversion from manual to automated refuse collection. After six subsequent phases, automated refuse collection was fully implemented on Oahu.

### 3. The City's Proposals for Employee Transfers

As a result of the completed conversion, some of the refuse baseyards had more manual collectors on staff than necessary. As a result, the City proposed an island-wide master pool system in which excess manual collectors from overstaffed baseyards would be temporarily placed, on a weekly basis, at baseyards experiencing staff shortages. Negotiations over the City's proposal took place sporadically throughout 2000, but a final agreement was never reached.

On August 16, 2001, the City gave UPW notice of its intent to unilaterally transfer thirteen manual collectors from the overstaffed Pearl City baseyard to the understaffed baseyard in Honolulu.[7] Pursuant to the CBA, the transfer proposal was comprised of the employees with the least seniority in the Pearl City baseyard. Although the City offered to consult with UPW over this

---

4. No changes to the TWA were made between 1973 and the date of this appeal.

5. The record is unclear whether the demonstration project continued between June 30, 1992 and May 19, 1993.

6. The only transfers to be made since 1973 are those at issue in this case.

7. The City later amended its transfer proposal on October 29, 2001 by reducing the number of transfers from thirteen to ten. The City also identified each Pearl City employee to be transferred by name and position number and specified the positions that these employees would assume at the Honolulu baseyard. Pursuant to section 16.01(a) of UPW's CBA, the City noted that each employee would have his seniority transferred with him.

proposal under HRS § 89–9(c) (Supp.2000),[8] UPW refused to meet, contending that the proposal required mandatory bargaining under HRS § 89–9(a) (Supp.2000).[9] On September 26, 2001, the City withdrew its master pool proposal in light of its intent to alleviate the deficiency in the Honolulu baseyard through unilateral transfers, rather than a negotiated master pool agreement.

## B. *Procedural Background*

On September 26, 2001, UPW filed its first amended complaint[10] with the HLRB, alleging that, inasmuch as the City failed to negotiate over the transfer proposal, the City committed a prohibited practice in violation of HRS §§ 89–13(a)(1), (5), (7) and (8) (1993)[11] by, *inter alia*, wilfully (1) violating section 1.05 of the CBA[12] and (2) refusing to bargain in good faith over the mandatory subjects of collective bargaining prescribed by HRS § 89–9(a). The City responded, *inter alia*, that it did not commit a prohibited practice because the transfer proposal was not subject to negotiations under HRS § 89–9(d).

On March 15, 2002, the HLRB issued Decision No. 433, in which it identified the dispositive issue as whether the City's proposed transfer was prohibited by statute or the CBA. The HLRB ruled:

### CONCLUSIONS OF LAW

1.  This Board has jurisdiction over this complaint under HRS §§ 89–5(b) and 89–14.

2.  HRS § 89–13(a)(8) provides that it is a prohibited practice for an employer to violate the terms of the collective bargaining agreement.

3.  Based on the record, the Board concludes that the Employer violated Section 1.05 of the Unit 01 agreement and Subsection 11–H of the [TWA] by its unilateral decision to transfer ten manual refuse collection workers from the Pearl City baseyard to the Honolulu baseyard. The Employer thereby violated HRS § 89–13(a)(8).

4.  In determining whether the proposed transfer of the employees at issue is an exercise of management rights, the Board applied a balancing test to determine whether interference with management rights precludes negotiations on matters affecting working conditions. The Board concludes that the Employer's transfer of refuse workers is likely to have a substantial impact on the terms and conditions of employment for employees subject to the [TWA] and the consequent disruption of seniority at both baseyards is likely to have a deleterious effect upon the exercise of bargained-for rights which are seniority-based. The Board cannot find that the management right to transfer supercedes the rights contained in the bargaining agreement.

CRA vol. 4 at 1449.

On April 15, 2002, the City appealed the HLRB's order to the circuit court pursuant to HRS § 91–14 (1993). On October 4, 2002, the circuit court entered its final judgment

---

8. HRS § 89–9(c) states in pertinent part: "[A]ll matters affecting employee relations . . . shall be subject to consultation with the exclusive representatives of the employees concerned."

9. HRS § 89–9(a) is quoted in section III, *infra*.

10. UPW's original complaint was filed on February 5, 2001.

11. HRS § 89–13(a) provides in pertinent part:
    It shall be a prohibited practice for a public employer or its designated representative wilfully to:
    (1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;
    . . . .

(5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9;
. . . .
(7) Refuse or fail to comply with any provision of this chapter;
(8) Violate the terms of a collective bargaining agreement[.]

12. Section 1.05 of the CBA provides in pertinent part, "No changes in wages, hours or other conditions of work contained herein may be made except by mutual consent." UPW contended that the transfer proposal constituted a unilateral change in "conditions of work."

and order affirming the decision of the HLRB. On October 31, 2002, the City timely filed its notice of appeal to this court.

## II. STANDARDS OF REVIEW

### A. Review of an Agency Decision

██ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) § (1993)] to the agency's decision.

HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

*Paul's Elec. Serv., Inc. v. Befitel,* 104 Hawai'i 412, 416, 91 P.3d 494, 498 (2004) (citations and quotation marks omitted). "Pursuant to HRS § 91–14(g), an agency's conclusions of law are reviewed de novo." *Id.* at 420, 91 P.3d at 502 (citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

### B. Statutory Interpretation

██ Questions of statutory interpretation are questions of law to be reviewed *de novo* under the right/wrong standard.

Our statutory construction is guided by the following well established principles:

our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning."

*Guth v. Freeland,* 96 Hawai'i 147, 149–50, 28 P.3d 982, 984–85 (2001) (citations omitted) (ellipsis points in original).

## III. DISCUSSION

██ On appeal, the City contends, *inter alia,* that the circuit court erred in affirming the HLRB's order inasmuch as the HLRB committed an error of law in concluding that the City's transfer proposal was subject to collective bargaining under HRS § *89–9(a).* The City argues that its proposed transfer is excluded from collective bargaining as a management right under the plain language of HRS § *89–9(d).* Thus, this court must determine whether the City's proposed transfer is subject to collective bargaining

under HRS § 89–9(a) or excluded from collective bargaining under HRS § 89–9(d).

HRS § 89–9 provides in pertinent part:

(a) *The employer and the exclusive representative shall meet at reasonable times . . . and shall negotiate in good faith with respect to wages, hours . . . and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement* [.]

. . . .

(d) Excluded from the subjects of negotiations are matters of classification and reclassification, benefits of but not contributions to the Hawaii public employees health fund, retirement benefits except as provided in section 88–8(h), and the salary ranges now provided by law. . . . *The employer and the exclusive representative shall not agree to any proposal* which would be inconsistent with merit principles or the principle of equal pay for equal work pursuant to section 76–1, 76–2, 77–31, and 77–33, or *which would interfere with the rights of a public employer to* (1) direct employees; (2) determine qualifications, standards for work, the nature and contents of examinations, hire, promote, *transfer*, assign, and retain *employees in positions* and suspend, demote, discharge, or take other disciplinary action against employees for proper cause; (3) relieve an employee from duties because of lack of work or other legitimate reason; (4) maintain efficiency of government operations; (5) determine methods, means, and personnel by which the employer's operations are to be conducted; and take such actions as may be necessary to carry out the missions of the employer in cases of emergencies; provided that *the employer and the exclusive representative may negotiate procedures governing the promotion and transfer of employees to positions within a bargaining unit,* procedures governing the suspension, demotion, discharge, or other disciplinary actions taken against employees, and procedures governing the layoff of employees; provided further that violations of the procedures so negotiated may be the subject of a grievance process

agreed to by the employer and the exclusive representative.

(Emphases added.)

In *University of Hawai'i Professional Assembly v. Tomasu,* 79 Hawai'i 154, 161, 900 P.2d 161, 168 (1995), this court addressed HRS § 89–9, stating:

[HRS §§ ] 89–9(a), (c) and (d) must be considered in relationship to each other in determining the scope of bargaining. For if Section 89–9(a) were considered disjunctively, on the one hand, all matters affecting the terms and conditions of employment would be referred to the bargaining table, regardless of employer rights. On the other hand, Section 89–9(d), viewed in isolation, would preclude nearly every matter affecting terms and conditions of employment from the scope of bargaining. . . .

Bearing in mind that the Legislature intended Chapter 89 to be a positive piece of legislation establishing guidelines for joint-decision making . . . we are of the opinion that *all matters affecting wages, hours and working conditions are negotiable and bargainable, subject only to the limitations set forth in Section 89–9(d).*

(Emphasis in original.)

■■ In the instant case, the HLRB interpreted our holding in *Tomasu* to entitle it to conduct a balancing test in order to determine whether collective bargaining was required for the City's transfer proposal. The HLRB weighed the effect of the transfer proposal on the "working conditions" of the refuse collectors under HRS § 89–9(a) against the interests of the City in preserving its management rights under HRS § 89–9(d). As previously indicated, the HLRB ruled that, inasmuch as: (1) the City's proposed transfer was likely to have a substantial impact on the terms and conditions of employment for refuse collectors in the Honolulu baseyard (*i.e.,* the Pearl City collectors would displace the seniority status of Honolulu collectors) and (2) the impact on the City's management rights was insignificant (*i.e.,* no transfers were made in 25 years), the City's proposal was subject to collective bargaining under HRS § 89–9(a). We disagree.

Although judicial deference to agency expertise is generally accorded where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are subject to review, *this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history.*

*Morgan. v. Planning Dept., County of Kaua'i,* 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004) (emphasis added). Under well-established rules of statutory construction,

where there is no ambiguity in the language of a statute, and the literal application of the language would not produce an absurd or unjust result, clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning.

*Reefshare, Ltd. v. Nagata,* 70 Haw. 93, 99, 762 P.2d 169, 173 (1988) (citation and quotation marks omitted).

The plain language of HRS § 89-9(d) is clear and unambiguous that "[t]he employer and the exclusive representative shall not agree to any proposal ... which would interfere with the rights and obligations of a public employer to ... [h]ire, promote, *transfer,* assign, and retain employees in positions." (Emphasis added). As such, the HLRB's interpretation of HRS § 89-9 is not entitled to judicial deference. Moreover, with respect to the balancing test employed by the HLRB, HRS § 89-9 does not expressly state or imply that an employer's right to transfer employees is subject to a balancing of interests. Contrary to the HLRB's interpretation, our holding in *Tomasu* does not approve of the HLRB's balancing test. Rather, we believe *Tomasu* stands for the proposition that, in reading HRS §§ 89-9(a), (c) and (d) together, parties are permitted and encouraged to negotiate all matters affecting wages, hours and conditions of employment as long as the negotiations do not

infringe upon an employer's management rights under section 89-9(d). In other words, the right to negotiate wages, hours and conditions of employment is subject to, not balanced against, management rights. Accordingly, in light of the plain language of HRS § 89-9(d), we hold that the HLRB erred in concluding that the City's proposed transfer was subject to collective bargaining under HRS § 89-9(a).[13]

## IV. *CONCLUSION*

Based on the foregoing, we reverse the circuit court's April 4, 2002 final judgment.

---

**13.** However, we note that the City and UPW may negotiate *procedures* governing the promotion and transfer of employees to positions within a bargaining unit. *See* HRS § 89-9(d); *Univ. of Hawai'i Prof'l Assembly v. Univ. of Hawai'i,* 66

Haw. 207, 211–12, 659 P.2d 717, 719–20 (1983) (holding that the right to refuse promotions is a management right, but the procedures for exercising this right are negotiable).