**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000827
31-AUG-2021
07:55 AM
Dkt. 79 MO**

CAAP-17-0000827


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


IN THE MATTER OF HAWAII FIRE FIGHTERS ASSOCIATION,
IAFF, LOCAL 1463, AFL-CIO Complainant-Appellant-Appellant,
and
RICK BLANGIARDI, MAYOR, CITY AND COUNTY OF HONOLULU;
LIONEL CAMARA, JR., ACTING FIRE CHIEF,
CITY AND COUNTY OF HONOLULU;
HONOLULU FIRE DEPARTMENT, CITY AND COUNTY OF HONOLULU;
and CITY AND COUNTY OF HONOLULU,
Respondents-Appellees-Appellees,
and
HAWAII LABOR RELATIONS BOARD; KERRY KOMATSUBARA;
SESNITA A.D. MOEPONO; and J N. MUSTO (2016-001),
Agency-Appellees-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 16-1-1390-07)


MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Leonard and Nakasone, JJ.)

Complainant-Appellant-Appellant Hawaii Fire Fighters

Association, IAFF, Local 1463, AFL-CIO (**HFFA** or the **Union**)

appeals from the November 7, 2017 Final Judgment (**Judgment**)

entered by the Circuit Court of the First Circuit (**Circuit**

**Court**),[1] in favor of Respondents-Appellees-Appellees Rick Blangiardi, Mayor,[2] City and County of Honolulu; Lionel Camara, Jr., Acting Fire Chief,[3] City and County of Honolulu; Honolulu Fire Department, City and County of Honolulu (**HFD**); and City and County of Honolulu (collectively, the **City**), and Agency-Appellee-Appellee Hawaii Labor Relations Board (**HLRB** or the **Board**), including Kerry Komatsubara, Sesnita A.D. Moepono, and J.N. Musto (collectively, the **Agency**).  HFFA also challenges the Circuit Court's October 19, 2017 Order Affirming [HLRB's] Findings of Fact [(**FOFs**)], Conclusions of Law [(**COLs**)], and Decision and Order Dated June 21, 2016 (**Order Affirming HLRB**), and November 7, 2017 Notice of Entry of Final Judgment.

This appeal arises out of a Prohibited Practice Complaint (**Complaint**) filed by HFFA with the Board, which alleged that HFD failed to properly consult and/or negotiate with HFFA regarding implementation of a Rapid Intervention Team (**RIT**) fire fighter training program, in violation of various provisions of Hawaii Revised Statutes (**HRS**) Chapter 89, as well as the parties' collective bargaining agreement (**CBA**).  Upon conclusion of multiple evidentiary hearings on the Complaint, the Board issued

---

[1]     The Honorable Keith K. Hiraoka presided.

[2]     Pursuant to Rule 25(d) of the Hawaiʻi Rules of Civil Procedure (**HRCP**), Mayor Rick Blangiardi is substituted for former Mayor Kirk Caldwell.

[3]     Pursuant to HRCP Rule 25(d), Acting Fire Chief Lionel Camara, Jr. is substituted for former Fire Chief Manuel Neves (**Chief Neves**).

its FOFs, COLs, and Decision and Order (**Decision 482**), finding no prohibited practice by HFD and dismissing the Complaint in its entirety.

HFFA appealed to the Circuit Court, which affirmed Decision 482. HFFA timely filed a notice of appeal to this court on November 13, 2017, contending that the Circuit Court erred in affirming Decision 482.

After reviewing the record on appeal and the relevant legal authorities, and giving due consideration to the issues and arguments raised by the parties, we affirm.

I.   BACKGROUND

A.   Underlying Facts

On February 4, 1972, HFFA was certified as the exclusive representative for State of Hawaiʻi fire fighters, bargaining unit 11 (**BU 11**), consisting of supervisory and non-supervisory employees at Hawaii's fire departments.[4] The Certification Order provided that the City and County of Honolulu, along with the counties of Hawaiʻi, Kauaʻi, and Maui, was required to "bargain collectively with [HFFA] and enter into a written agreement with [HFFA] with respect to wages, hours, and other terms and conditions of employment which are subject to negotiations under the [Hawaiʻi Public Employment Relations

_____

[4]     Pursuant to the Certification of Exclusive Bargaining Representative and Order to Negotiate (**Certification Order**), BU 11 does not include:  "Administrative and Service Bureau Captain, Service Officer, Fire Suppression Operations Commander, Chief, Deputy Chiefs, Hawaii Battalion Chiefs, Fire Division Commander No. F-149, and all others."

Act]."  The CBA at issue in this case was in effect from July 1, 2011, to June 30, 2017.

On August 5, 2014, HFD issued a Special Notice,[5] SN-14-201, instructing all uniformed personnel to complete mandatory online International Association of Fire Fighters (**IAFF**) Fire Ground Survival (**FGS**) training and informing them of three days of FGS field training to be conducted that November by HFD instructors.  A follow-up Special Notice, SN-14-213, issued the next day, invited fire fighters to sign up for "Train-the-Trainer" training to become instructors for the planned field course.  Following consultation discussions between HFD and HFFA, the FGS field training course began in approximately February 2015.

In April of 2015, HFD started planning an RIT training program[6] to build on the FGS training.  On October 16, 2015, HFD

---

[5]    A Special Notice is "a written notice that disseminates or distributes information" to HFD personnel.  Chief Neves testified that it is standard practice for Special Notices to be sent to the Union and estimated that approximately 300 or 400 Special Notices are issued by HFD each year.

[6]    RIT training is a National Fire Protection Association (**NFPA**) standard designed to promote the "safety of all fire suppression personnel" and "provide a constant, sustainable rapid intervention capability at the emergency scene."  HFD does not adopt NFPA standards *per se* but uses them as best practice guidelines.  Chief Neves testified that some form of RIT training had been part of HFD policy for approximately 10 to 15 years, but that the training program which began in 2015 was the first course implemented by HFD specifically to prepare fire fighters to be part of RITs, in accordance with NFPA standards.

Per the subsection entitled "RIT" of HFD's "Policy & Procedures Manual, Chapter 4-Fire Operations, Article 3-Emergency Response, Section 2-Safety":

RIT.  The [Incident Commander] shall provide personnel for the rescue of members operating at emergency incidents

(continued...)

4

issued a Special Notice, SN-15-179, inviting fire fighters to be trained as instructors for the planned RIT training.  The Special Notice specifically provided that "[a]ppropriate compensation for off-duty attendance is authorized."  On November 20, 2015, HFD issued a Special Notice, SN-15-201, indicating the 33 fire fighters who were selected to become RIT trainers and providing that they were to attend a five-day "Train-the-Trainer Training" from December 7 to 11, 2015.  All of the selected fire fighters were part of BU 11.

Both Chief Neves and Assistant Chief Socrates Bratakos (**AC Bratakos**) testified before the Board that HFD communicated its intent to conduct RIT training to Union representatives at a January 4, 2016 meeting, and that the parties discussed creating a working group for the program.[7]  Chief Neves testified further that while HFD did not believe the RIT training required consultation, it was HFD's desire to "open" the planning process and involve HFFA "from the get-go."  On January 7, 2016, HFD sent HFFA President Robert Lee (**President Lee**) a letter regarding RIT

_____

(...continued)
    if the need arises.  A RIT shall consist of at least four members and be available to rescue downed, trapped, lost, or disorientated fire fighters during emergency operations. . .

    A RIT shall be established at every confirmed building fire and for any other incident where an extreme life safety hazard exists for responding fire fighters.

[7]    Chief Neves testified that the January 4, 2016 meeting was part of a series of monthly meetings with HFFA, which began in October, 2015.

training, announcing HFD's desire to form a working group and requesting HFFA designate its representatives for the group.

By letter dated January 11, 2016 (**January 11 Letter**), HFFA requested the following information regarding the RIT working group:

1.   What is meant by 'Working Groups?';

2.   What are these group's [sic] charge?;

3.   What are the policy, guidelines, and criteria, if any, provided to the groups to develop recommendations?;

4.   What authority does these groups [sic] have in selecting other BU11 members in the process; and

5.   What remuneration, if any, is given to BU11 members who participate in these groups.

By letter dated January 15, 2016 (**January 15 Letter**), HFFA responded to HFD's request to form a working group, stating HFFA's position that a working group was "premature in light of additional information needed in order to thoroughly discuss all aspects of the [RIT] Training working group."  The January 15 Letter also requested consultation on the RIT training program and its curriculum, and stated that HFFA would contact HFD to schedule a consultation meeting after receipt of the requested information.

On January 20, 2016, HFD responded to the January 11 Letter, providing answers to each of the questions posed therein. On January 27, 2016, HFD responded to the January 15 Letter:  (1) incorporating by reference the answers provided in its preceding response; (2) indicating that HFD would produce the requested materials on the RIT curriculum in advance of the monthly

HFD/HFFA meeting on February 8, 2016; and (3) noting that due to the "time sensitive nature" of the RIT program, HFD would like to schedule a consultation meeting for the week beginning February 16, 2016.  On February 3, 2016, HFD emailed HFFA a draft curriculum, schedule, and instructor list for the RIT program.

On February 4, 2016, HFFA sent HFD an acknowledgment (**February 4 Letter**) of HFD's January 20 and January 27 letters, entitled "[HFD] Working Groups."  Therein, HFFA demanded immediate "consultation on the purpose and function of HFD Working Groups," and submitted a series of questions regarding the working group and RIT program which were to be answered in a requested "proposal" from HFD, to be produced by the following day.  The February 4 Letter did not contain any mention of the materials HFD provided the previous day.

AC Bratakos testified, and the Board found, that on February 11, 2016, HFD discussed the RIT program with HFFA and conducted a "walkthrough" of the facility where the training was to take place, at which time no objections were raised.[8]

On February 24, 2016, HFD responded to the February 4 Letter, providing answers to each of the questions posed by HFFA, incorporating by reference the RIT curriculum, schedule, and instructor list emailed to HFFA on February 3rd, and attaching an Emergency Action Plan for the training.  HFD also reiterated its

---

[8]     President Lee and at least one other HFFA board member were in attendance.

invitation for HFFA to participate in the working group and assist with development of the training program.  HFD stated that it would "request a consultation meeting with [HFFA] when the RIT Working Group discovers issues that significantly affect wages, benefits, or working conditions."  Chief Neves testified, and the Board found, that while a working group was formed by HFD, HFFA did not participate.[9]  The Board found:

> At [that] point, HFD determined that it could not wait for HFFA to participate in the formulation of the RIT Program protocols (there were issues with the lapse of funding by June 30, 2016, and more importantly, starting training was crucial for the safety of the OPS personnel), and HFD started to implement the RIT Program.

On March 1, 2016, HFD issued a Special Notice, SN-16-044, to all fire fighters providing for mandatory participation in the RIT course for all Fire Operations (**OPS**) personnel,[10] "scheduled for off-duty attendance" beginning April 2016, with "appropriate compensation authorized."  The Special Notice further stated:

> [HFD] RIT instructors will conduct this training, which encompasses self-survival procedures, panic management, communications, low/reduced profile rescues, disentanglement maneuvers, upper floor rescue techniques, and RIT operations.  Training shall be attended on two consecutive days.  Students who successfully completed the [IAFF] FGS course that was offered in 2015 and also complete this RIT course will receive an FDTN [(Fire Department

---

[9]     At the time of HFD's February 24, 2016 letter to HFFA, the working group consisted of AC Bratakos and the Battalion Chiefs and Fire Captains from Fire Operations and the Training and Research Bureau who were responsible for the training.

[10]     OPS personnel includes all fire fighters that work in HFD's fire stations, *i.e.*, HFD's fire suppression forces.  RIT training was made voluntary for bureau personnel, *i.e.*, those not engaged in fire suppression activities.

Training Network)[11]] Certificate of Completion. A schedule for the RIT training was attached to Special Notice SN-16-044.

At the behest of HFFA, Captain Thomas Reppuhn (**Captain Reppuhn**), an HFFA board member and representative on the joint HFD-HFFA safety committee,[12] visited the training facility where RIT training was to take place to evaluate safety aspects during a "test run" of the program on March 11, 2016.  That same day, Captain Reppuhn advised Assistant Chief Scott Lawton (**AC Lawton**), by email, that he had serious concerns regarding the potential for bodily injury to fire fighters participating in the training and demanded an emergency meeting of the safety committee.[13]  AC Lawton replied later that day to schedule the meeting and solicit further information regarding Captain Reppuhn's concerns so that HFD could address them "immediately."

On March 15, 2016, the safety committee convened to discuss the RIT training program.  At the meeting, Captain Reppuhn stated that based on his observations of the March 11 test run, it was HFFA's position that the training should be suspended pending "consultation with HFFA" and a "thorough safety

---

[11]    FDTN is an organization which provided the RIT curriculum implemented by both Maui Fire Department and Federal Fire Fighters stationed in Hawaiʻi prior to adoption by HFD.

[12]    Captain Reppuhn was joined at the training facility by fellow HFFA Board Member Bill Thornock.

[13]    Captain Reppuhn testified that he did not notify anyone at the training facility of his safety concerns.

review of [the] program."  AC Lawton testified, and the Board found, that both he and Battalion Chief Ryan Young (**BC Young**) asked Captain Reppuhn to share specifics on his concerns regarding the RIT program and that Captain Reppuhn refused to do so.  HFD did not resolve to suspend the program but agreed to schedule a walkthrough of the program for March 28, 2016.

After the emergency meeting, Captain Reppuhn emailed a list of his safety concerns to President Lee, along with a summary of the meeting.  Captain Reppuhn recommended HFFA contact Hawaii Occupational Safety and Health (**HIOSH**) to do an inspection.  In recapping the safety meeting, Captain Reppuhn commended BC Young for his "immediate intervention" regarding RIT safety protocols, stating BC Young (1) "identified numerous concerns," (2) gave "recommendations to HFD to make corrections," and (3) had already addressed several of the issues identified at the March 11 test run.

On March 21, 2016, HFFA filed a "Formal Complaint Related to the Safety and Health of Hawaii Fire Fighters" with HIOSH (**HIOSH Complaint**).  The gravamen of the HIOSH Complaint was that "[t]he RIT program as it is currently being implemented, threatens *physical harm and creates an environment whereby imminent danger exists that can reasonably cause serious physical harm and/or death*."  HFFA requested that HIOSH conduct a site inspection and review of the RIT program in the presence of its representatives and asked HIOSH to require full disclosure from

HFD regarding the training to be reviewed by HIOSH to "insure no additional safety hazards exists [sic]."  Appended to the HIOSH Complaint was a "Labor Agreement Grievance Form," apparently filed March 15, 2016, alleging violations of several sections of the CBA and demanding consultation, negotiation, and suspension of the RIT training.  After exchanges between HIOSH, HFD, and the Union regarding the HIOSH Complaint, HIOSH found HFD's internal investigation and corrective actions to be "satisfactory" and closed the HIOSH Complaint on April 20, 2016.

On March 22, 2016, while the HIOSH Complaint was still pending, the Union sent HFD a letter demanding HFD cease implementation of the RIT training and make the training voluntary, pending negotiation with the Union as to whether the training may be mandatory.  The following day, Captain Reppuhn sent HFD a similar letter in his capacity as a Union representative on the safety committee.

On March 28, 2016, HFD held a two-hour walkthrough of the RIT training facility with Captain Joseph Condlin (**Captain Condlin**), who led the training, for the safety committee, with President Lee and other representatives of HFD and HFFA in attendance.  Captain Reppuhn testified that the walkthrough consisted of demonstrations of several training elements and was followed by a meeting wherein the parties discussed their respective positions.  On April 1, 2016, HFFA wrote to Chief Neves, reiterating its demand for consultation.  On April 12,

2016, the safety committee met to follow-up on the March 28 walkthrough, among other issues; however, Captain Reppuhn testified that HFFA acquiesced to HFD's position that there was "no reason to discuss [RIT]" given that the HIOSH Complaint was pending.

B.    Board Proceedings

On March 30, 2016, HFFA filed the prohibited practice Complaint at issue in this appeal, challenging HFD's adoption and implementation of the RIT training program.  The Complaint alleged that HFD's intentional and willful failure and/or refusal to consult or negotiate with HFFA regarding the RIT program (1) violated various provisions of the BU 11 CBA pertaining to "Recognition,"[14] (2) violated the duty to bargain in good faith

---

[14]    The Complaint alleged violations of "Section 1(A), (B) and/or (C) of the [CBA]."  Section 1 of the CBA states, in relevant part:

> A. Recognition.
>       The Employer recognizes the Union as the certified exclusive bargaining representative of all fire fighters, including supervisory personnel, of the State and its political subdivisions whose principal duties are to prevent and respond to fires, attend to search and rescue, HAZMAT and medical emergencies, except for officers and Employees who are excluded or may be excluded from the bargaining unit by law and the Hawaii Labor Relations Board.
>       . . . .
>
> B. Consultation.
>       All matters affecting Employee relations, including those that are, or may be, the subject of a regulation promulgated by the Employer or any Personnel Director, are subject to consultation with the Union.  The Employer shall consult with the Union prior to effecting changes in any major policy affecting Employee relations.
>
> C. Mutual Consent.
>       No changes in wages, hours or other conditions of employment contained herein may be made except by mutual consent.

over changes in wages, hours, and other terms and conditions of employment under HRS § 89-9(a) (Supp. 2015) and the duty to consult under HRS § 89-9(c) (2012),[15] (3) constituted "bad faith," and (4) constituted prohibited labor practices under HRS § 89-13(a)(1), (5), (7), and (8) (2012).[16]

---

[15]    HRS § 89-9 provides, in relevant part:

> **HRS § 89-9  Scope of negotiations; consultation.**  (a) The employer and the exclusive representative shall meet at reasonable times, . . . and shall negotiate in good faith with respect to wages, hours, the amounts of contributions by the State and respective counties to the Hawaii employer-union health benefits trust fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to collective bargaining and which are to be embodied in a written agreement as specified in section 89-10, but such obligation does not compel either party to agree to a proposal or make a concession.
>
> . . . .
>
> (c)  Except as otherwise provided in this chapter, all matters affecting employee relations, including those that are, or may be, the subject of a rule adopted by the employer or any director, shall be subject to consultation with the exclusive representatives of the employees concerned.  The employer shall make every reasonable effort to consult with exclusive representatives and consider their input, along with the input of other affected parties, prior to effecting changes in any major policy affecting employee relations.

[16]    HRS § 89-13 (2012) provides, in relevant part:

> **HRS § 89-13  Prohibited practices; evidence of bad faith.**  (a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
>
>> (1)    Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;
>
> . . . .
>
>> (5)    Refuse to bargain collectively in good faith with the exclusive representative as required in section 89-9;
>
> . . . .
>
>> (7)    Refuse or fail to comply with any provision of this chapter; [or]

(continued...)

On April 11, 2016, HFD filed an Answer to the Complaint, denying all legal conclusions set forth therein, asserting a variety of defenses,[17] and requesting dismissal of the Complaint as well as attorneys' fees and costs.

On April 15, 2016, HFFA filed a Motion for Interlocutory Relief seeking to enjoin, restrain, and prohibit HFD from "further unilateral modification and violation of the [CBA], and further violations of [HRS Chapter 89], pending the issuance of a final determination on the instant [Complaint]." Attached thereto, HFFA submitted, *inter alia*, Declarations of Thomas Reppuhn and Irene L.A. Puʻuohau, along with exhibits depicting alleged safety issues regarding the RIT program.  HFD opposed the motion.

The Board held evidentiary hearings on May 11-12, 16, and 18-19, 2016.  Six witnesses were called and examined by both parties and HLRB:  Chief Neves; AC Lawton; AC Bratakos; Captain Reppuhn; President Lee; and Captain Condlin.

On June 21, 2016, the Board entered Decision 482, finding for HFD and dismissing HFFA's Complaint.  The Board

---

(...continued)
> (8)   Violate the terms of a collective bargaining
>        agreement[.]

[17]    HFD's Answer asserted the following defenses:  (1) the Complaint failed to state a claim upon which relief can be granted; (2) HLRB lacked subject matter jurisdiction to hear the Complaint; (3) HFFA was precluded from relief by the equitable doctrines of waiver, acquiescence, election, untimeliness, estoppel, unclean hands and laches; (4) HFFA was precluded from relief based on its failure to exhaust mandatory and available contractual remedies; and (5) HFFA failed to establish a violation of HRS Chapter 89 and/or the CBA.

framed the question presented as follows:  "Did [HFD] commit a 'prohibited practice' by adopting and implementing a program to train fire fighters to rescue trapped or disoriented fire fighters without negotiating or consulting with the [HFFA]?"  The Board concluded that HFD's adoption of the training program did not constitute a prohibited practice.

Decision 482 contained extensive FOFs regarding, *inter alia*, the CBA, the nature and necessity of RIT training, HFD's attempts to engage the Union in a working group to develop and implement the training, the Union's safety concerns regarding the training, and the corresponding HIOSH Complaint and HFD's corrective actions.

Based on its FOFs, the Board found and concluded:

(a)  The RIT Program is not specialized training, but instead is standard training for OPS personnel.  The RIT Program is subject to the consultation requirement, and not the negotiation or mutual consent requirement.  First, the CBA provides in CBA Section 48.B that HFD may require training as long as the fire fighters are compensated for working their days off.  There is no requirement for mutual consent or negotiation.  Second, and more important, HFFA treated the RIT Program as a subject of consultation and not negotiation.  Finally, and most importantly, HFFA failed in its burden of showing, factually and legally, that the RIT Program was subject to the negotiation requirement.

(b)  On January 7, 2016, HFD invited HFFA "to form a working group for the [RIT Program]."  As outlined above, HFFA did not accept HFD's invitation to discuss the RIT Program at its inception.  Subsequently, HFD did, in fact, request consultation in its January 27, 2016 letter to HFFA. However, rather than engaging in consultation over the implementation of the RIT Program, HFFA changed tactics and requested consultation on the issue of working groups. Thus, although HFD attempted to engage HFFA in discussions over the RIT Program in January 2016, HFFA did not consult and engaged in efforts to stop implementation of the RIT Program.

Moreover, the Board finds that HFD's repeated efforts to have HFFA participate in the RIT Program working group, even though not called "consultation," **amounted to a request**

**to engage in meaningful discussions or dialog regarding implementation of the RIT Program**.  In substance, if not form, HFD asked HFFA to be involved in the formulation of the procedures and protocols for the implementation of the RIT Program.  For reasons not clear to the Board, HFFA refused to participate.  Therefore, **in substance, HFD did, in good faith, initiate the consultation process**.  HFFA, by engaging in efforts to question the legitimacy of the working group concept, was undermining the very purpose of the consultation requirement -- to have the parties meaningfully discuss issues to avoid disputes.  For the Board to rule otherwise and to accept the position taken by HFFA (i.e., the use of a working group did not amount to consultation) would undermine the utility of the consultation process by "elevating form over substance," and the Board refuses to do so.

(c)  **HFD did not violate its obligation to consult with HFFA**.  Consultation does not require the agreement of the parties.  As stated by the Board in *In the matter of HGEA, AFSCME, Local 152, AFL-CIO, Complainant, and Linda Lingle, et al., Respondents,* Decision 468 (June 13, 2007) at p. 9 (adopting the position taken in, and quoting from, *Hawaii Nurses Association,* 2 HPERB 218 (1979)):

> "Matters of consultation do not require a resolution of differences.  '<u>All that is required is that the employer inform the exclusive representative of the new or modified policy and that a dialogue as to the merits and disadvantages of the new or proposed policy or policy change take place</u>.'  Cites omitted."

The Board, then confirmed its adoption of the test articulated in Decision No. 394, *Hawaii Government Employees Association, AFSCME, Local 152, AFL-CIO*, VI HLRB 1 (1978).  Decision No. 394 requires management to comply with the following factors:

> "(1) [N]otice to the union, (2) on proposed personnel practices and policies of a major, substantial and critical nature, other than those requiring negotiations, (3) in reasonable completeness and detail, (4) requesting the opinion, advice or input of the Union thereto, (5) listening to, comparing views and deliberating together thereon (i.e., 'meaningful dialog'), and (6) without requirement of either side to concede or agreement on any differences or conflicts arising or resulting from such consultation."

Here, **HFD, in fact, complied with the Decision 394 factors because**:

(1)  HFFA was notified (orally and in writing) in January 2016 that, as part of its new training program, HFD was contemplating the adoption of the RIT Program to better equip OPS personnel to engage in fire fighter rescue.  This was early in the process.  In addition, HFD proposed the formation and use of the RIT working group to foster discussions over the RIT Program.  While the RIT working

16

group was not intended to supplant consultation, it was the start -- it was an opportunity to identify those issues which required either consultation or negotiation and then begin the appropriate process.

Furthermore, on March 11, 2016, when Captain Reppuhn advised AC Lawton that he had serious safety concerns regarding the RIT Program, HFFA did not disclose those concerns to HFD, HFFA did not discuss those concerns with HFD, and was, as of March 15, 2016, already preparing to file the HIOSH complaint.  If any party did not engage in consultation, it would have been HFFA.

(2)  While not subject to the negotiation requirement, the RIT Program involved proposed training which was "major, substantial and critical" to the safety of OPS personnel.

(3)  Since the RIT Program was in its infancy, HFD provided as much material as it could to HFFA.  In addition, HFFA and its members were well aware of the RIT Program because of the initiation of the "train-the-trainer" program initiated and completed in October or December 2015.  Thus, in its response to various inquiries from HFFA and by initiating the "train-the-trainer" program, HFD provided HFFA with available information with reasonable detail and completeness.

(4)  By proposing the RIT working group, HFD was "requesting the opinion, advice or input of" HFFA.  Again, in substance, HFD was inviting HFFA to participate meaningfully in the process of finalizing the implementation of the RIT Program.

(5)  There was no "meaningful dialog" because HFFA, rather than engaging in discussions, sought to delay or otherwise prevent the initiation of discussions.

(6)  Finally, HFD never stated that the RIT working group required that either side needed to agree.  HFD understood that consultation meant exactly that, i.e., seeking the input from HFFA on a crucially important safety program.

Based on the foregoing, the Board finds that HFD fulfilled its obligation to consult with HFFA over the RIT Program implementation.

(d)  **HFFA failed to provide any factual basis for a finding that HFD violated the CBA**.  Other than point to [President] Lee's testimony that there may be:

"*potential* violations of Section 1. Recognition, consult, negotiate; Section 4. Management Rights, Respondents abuse their management rights; Section 6. Prior Rights, Benefits and Perquisites, because according to the Special Notice, the training can impact where you are assigned; Section 12. Promotions, because failing to attend or participate in the full two days of the training could impact a promotion, or future promotional opportunity; Section

17

14. Duties, because the RIT training changes the duties of a firefighter; Section 20. Hours of Work, because Respondents are compelling employees to come in or work on their scheduled days off; Section 21. Overtime, clearly may be impacted; Section 30. Meals, because the Special Notice requires employees to bring in their own lunch; when it should be provided by the Employer; Section 39. Safety and Health, because of the misinterpretation by Scott Lawton; Section 43. Equipment, could be impacted based on the employees being provided the proper safety equipment during the RIT training; Section 14. Employer Required Training, because Respondents are misinterpreting what an employer-required training is.  (Italics added.)"

There are no facts to support a showing that there was an *actual* violation of the CBA by HFD.  Further, as addressed above in detail, although the RIT Program was mandatory, it was not "pass/fail" (as was the Maui training) and was participatory only.  The RIT Program was part of OPS personnel regular training and was not a new minimum requirement.  Finally, all of the issues raised by [President] Lee could have been discussed in detail in the working group suggested by HFD in January 7, 2016.  Thus, **the Board finds that there is simply no violation of the CBA**.

(e)  There are no facts showing that HFD acted wilfully, which is a required element to prove a prohibited practice pursuant to HRS Chapter 89.  Although there was much evidence regarding the circumstances surrounding the implementation of the RIT Program, there was no evidence to show that HFD consciously, knowingly, and deliberately intended to violate the provisions of HRS Chapter 89 or the CBA.  In fact, the whole intent of adopting and implementing the RIT Program was to adequately train OPS personnel in rapid intervention team techniques, procedures and equipment to save lives and prevent serious injuries -- to help HFFA's members when they become trapped or disoriented while fighting a fire.  This was prompted by, among other things, Chief Neves losing a fire fighter, national efforts to improve fire fighter safety, the implementation of rapid intervention team training by Maui and Hawaii Counties (without, apparently, objection by HFFA) and the Hawaii based Federal Fire Fighters and the need to train fire fighters in an operation required by HFD Policy -- rapid intervention teams.  In other words, OPS personnel need to be properly and continuously trained because worker safety in an inherently dangerous profession is a constant concern.  Thus, to make its rapid intervention teams effective in emergency situations was HFD's motivation for training all OPS personnel and HFD's motivation to adopt and implement the RIT Program, and HFFA provided no evidence to the contrary.

(f)  With respect to HFFA's request for injunctive relief, the Board finds that:

(1)  The Board, based on the foregoing, finds and holds that HFFA does not prevail on the merits.  Thus, since

18

HFFA cannot prevail on the merits, it is not entitled to injunctive relief, whether preliminary or permanent.

(2)    Further, there has been no showing of irreparable harm.  There are no worker safety issues extant with respect to the HFD's Charles H. Thurston Fire Training Center where the RIT training is conducted.  There is no showing that the OPS personnel, who must meet certain minimum fitness and training requirements separate and apart from the RIT Program, would be subject to any unreasonable risk of harm.

(3)    Finally, it is clear that the public interest overwhelmingly tips in favor of HFD.  The purpose of the RIT Program is to train HFD's OPS personnel (the personnel actually fighting fires and who are the most at risk) in rescue techniques and preparation to rescue their fellow fire fighters.  The purpose of the RIT Program is not to set different or additional minimum qualifications but to prepare HFD's personnel to save fire fighters who get into trouble, i.e., to prevent or minimize the risk of line-of-duty deaths and serious injuries.

HFFA was given the opportunity to comment upon and actually be involved in developing protocols for the implementation of the RIT Program through the RIT working group.  HFFA failed to cooperate and collaborate with HFD. It cannot now be heard to complain.

(Emphasis added; footnotes omitted; format altered).

The Board entered, *inter alia*, the following COLs:

(a)    The adoption and implementation of the RIT Program, and the mandatory training required to implement the RIT Program, are not topics subject to mandatory bargaining.  This is because:

(1)    The CBA does not require negotiation over employer required training so long as overtime is paid when training occurs on employees' days off.  HFFA could not identify any provision which required negotiations over required training.

(2)    Pursuant to HRS § 89-9(d), by requiring OPS personnel to attend required training sessions (with the payment of overtime), HFD was exercising its management rights.  HFD retained the right to direct its employees, maintain efficiency and productivity, and determine the means, methods and personnel by which its operations were to be conducted.  Clearly, the adoption of the RIT Program and its implementation through the mandatory RIT Program training for OPS personnel was the exercise of a management right (i.e., directing HFD's OPS personnel to attend training, maintaining the efficiency of its personnel in rescue operation and determining how rescue operations were to be conducted and how its personnel were to be trained in rescue techniques).

(b)    The adoption and implementation of the RIT Program was, however, subject to the "consultation"

> requirement.  As outlined in detail above, HFD did not
> violate its obligation to consult with HFFA.  In fact, the
> Board found that HFD attempted, early on, to engage
> (through, for example, the proposed RIT working group) HFFA
> in meaningful dialog or discussions regarding the RIT
> Program.  However, HFFA was not willing to participate,
> listen and have meaningful dialog with HFD over the RIT
> Program.
>
>        (c)  Based on the foregoing, the Board concludes that
> HFD, in implementing the RIT Program did not violate its
> obligations under the CBA or HRS Chapter 89.  There was
> simply no showing of any violation by HFD.
>
>        (d)  Further, there was no showing the HFD acted
> wilfully. . . .

(Footnotes omitted; format altered).

Having determined that HFFA failed to establish by a preponderance of the evidence that HFD committed a prohibited practice, the Board concluded that HFFA was not entitled to any of the requested relief and dismissed the Complaint in its entirety.  With respect to the RIT training program, the Board ordered the parties to "engage in meet and confer" via the working group, and that future disputes regarding the RIT program were to be handled via the grievance process set forth in the CBA.

On July 12, 2016, approximately three weeks after entry of Decision 482, HFFA filed a motion for reconsideration pursuant to HRCP Rule 59(e), arguing that the Board misconstrued and misapplied HRS § 89-9(a) and (d) (2012 and Supp. 2015) (**Motion for Reconsideration**).  On July 22, 2016, the Board summarily

denied the Motion for Reconsideration as untimely under HRCP Rule 59(e).[18]

### C.    Appeal to the Circuit Court

HFFA appealed from Decision 482 to the Circuit Court, claiming that the substantial rights of BU 11 employees were prejudiced by the decision and seeking reversal and modification on the grounds that the decision was made:

> (1) in violation of constitutional and statutory provisions, (2) in excess of statutory authority or jurisdiction of the agency, (3) made upon unlawful procedure, (4) affected by other error of law, (5) clearly erroneous in view of the reliable, probative and substantive evidence on the whole record, and/or (6) arbitrary, capricious, and characterized by abuse of discretion and a clearly unwarranted exercise of discretion.

After briefing was complete, the Circuit Court heard oral argument on September 21, 2017.  At the close of oral argument, the Circuit Court concluded that there was substantial evidence in the record to support the FOFs and COLs contained in Decision 482.  The court affirmed Decision 482 and entered the Order Affirming Decision, denying and dismissing HFFA's appeal with prejudice.  On November 7, 2017, the court entered Final Judgment in favor of the City and the Agency.

On November 13, 2017, HFFA filed its notice of appeal to this court.

## II.  POINTS OF ERROR

HFFA raises four points of error on appeal, contending that the Circuit Court was wrong when it:  (1) affirmed the

---

[18]    HFFA does not challenge this ruling.

Board's findings and conclusions that the training of fire fighters affecting their safety, health, and other terms of employment were not mandatory subjects of bargaining; (2) affirmed Decision 482 despite the City's unilateral changes to existing terms of employment which constitute a refusal to bargain in good faith under HRS § 89-9(a); (3) disregarded the Union's contention that the Board erred as a matter of law over the City's circumvention of the Union as the exclusive bargaining agent of fire fighters; and (4) affirmed Decision No. 482 based on the management rights clause in HRS § 89-9(d)(7), contrary to the Constitution and legislative amendments.

III. <u>APPLICABLE STANDARDS OF REVIEW</u>

Our review of a circuit court decision on an appeal from an administrative agency determination is a secondary appeal; we must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (2012 and Supp. 2019) to the agency's decision. <u>Flores v. Bd. of Land & Nat. Res.</u>, 143 Hawaiʻi 114, 120, 424 P.3d 469, 475 (2018).

HRS § 91-14 provides in relevant part:

> (g)  Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> > (1)   In violation of constitutional or statutory provisions; or

> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." Flores, 143 Hawaiʻi at 121, 424 P.3d at 476 (citations omitted). The Hawaiʻi Supreme Court has stated:

> An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error. A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.
>
> As a general matter, a finding of fact or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, 128 Hawaiʻi 289, 302, 287 P.3d 190, 203 (2012) (**Del Monte II**) (citation omitted).

Additionally, our review is tempered by the "principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing

23

that the decision is invalid because it is unjust and unreasonable in its consequences."  Konno v. Cty. of Haw., 85 Hawaiʻi 61, 77, 937 P.2d 397, 413 (1997) (citation omitted). "Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency."  Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (citation omitted).

"Statutory interpretation is a question of law reviewable *de novo*."  Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, 112 Hawaiʻi 489, 499, 146 P.3d 1066, 1076 (2006) (**Del Monte I**) (citation and internal quotation marks omitted).  Statutory construction is grounded in the following principles:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> When there is ambiguity in a statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law.

State v. Abihai, 146 Hawaiʻi 398, 406, 463 P.3d 1055, 1063 (2020) (citation omitted).

In addition, it is a "'well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.'"  Del Monte I, 112 Hawaiʻi at 501 n.17, 146 P.3d at 1078 n.17 (citation omitted).

IV.  DISCUSSION

The pivotal issue here concerns whether HFD had a duty to bargain with HFFA prior to implementation of the RIT training program.  HFFA contends that the Board was incorrect to conclude that the adoption and implementation of the RIT training program were not topics subject to mandatory bargaining.  HFFA also contends that the Board erred in concluding that HFD was exercising its protected management rights in implementing the program.  Accordingly, HFFA maintains that the Circuit Court was wrong to affirm the Board's denial and dismissal of HFFA's Complaint.

Conversely, HFD submits that the Circuit Court's Order Affirming HLRB must be affirmed because:

> (1) the HLRB did not commit clear error when it found that Employer did not have a duty to negotiate over RIT training, (2) the Board's application of the management rights doctrine under [HRS] § 89-9(d) was not clearly erroneous,

25

(3) the Board properly found that Employer satisfied its duty to consult, (4) HFFA failed to claim before the Board that Employer committed a prohibited practice when it solicited, trained, and used BU 11 members as trainers for RIT training without prior negotiation or consultation, (5) HFFA failed to prove that any violation of [HRS] Ch. 89 was willful, (6) the Union's appeal is moot, and (7) none of HFFA's other arguments have legal or factual merit.

A.    Mootness

At the outset, we consider HFD's argument that the instant appeal must be dismissed as moot given that the RIT training is completed, leaving no "live" case and controversy for this court to decide.  "It is axiomatic that mootness is an issue of subject matter jurisdiction."  In re Thomas H. Gentry Revocable Tr., 138 Hawaiʻi 158, 168, 378 P.3d 874, 884 (2016) (internal quotation marks and citation omitted).

A case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where "events . . . have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised."

In re Thomas, 73 Haw. 223, 226, 832 P.2d 253, 254 (1992) (citation omitted).

The supreme court has held that an agency's "[u]nchallenged findings are binding on appeal."  Poe v. HLRB, 97 Hawaiʻi 528, 536, 40 P.3d 930, 938 (2002).  Here, HLRB found that "the initial training held pursuant to the RIT Program would be followed by 'refresher' sessions."  HLRB also found that the RIT training was part of a larger scheme of ongoing training. Considering that neither party challenges these findings -- which are supported by HFD testimony during evidentiary hearings before

26

the Board -- and that HFFA sought injunctive and declaratory relief to prevent both the completed training *as well as future planned trainings*, we conclude that relations between the parties have not been so affected as to eliminate the requisite adverse interest and effective remedy necessary for justiciability of HFFA's claims.  See In re Thomas, 73 Haw. at 225-26, 832 P.2d at 254; see also State v. Nakanelua, 134 Hawaiʻi 489, 502, 345 P.3d 155, 168 (2015).  Thus, we conclude that the case is not moot.

B.    Duty to Negotiate

HFFA argues that the Circuit Court erred in affirming Decision 482 because the Board erred in concluding that HFD did not have a duty to negotiate over its implementation of the RIT program.  Specifically, HFFA contends that "RIT training vitally affected multiple terms and condition of employment of fire fighters and therefore constituted mandatory subjects of collective bargaining under [HRS § 89-9(a)]."  In addition, HFFA maintains that "the Board used the wrong standard to determine what subject matters required bargaining by looking solely to the [CBA] and [HRS § 89-9(d)] to determine the scope of bargaining." HFFA's arguments are unpersuasive.

The Complaint alleged, *inter alia,* violations of HRS § 89-13(a)(1), (5), (7) and (8).  In pertinent part, HRS § 89-13(a)(1) prohibits wilful interference with the right to collective bargaining under HRS Chapter 89.  HRS § 89-13(a)(5) makes it a prohibited labor practice for a public employer to

27

"[r]efuse to bargain collectively in good faith with the exclusive representative as required in section 89-9."  HRS § 89-13(a)(7) constitutes a general prohibition on wilful refusal or failure to comply with the provisions of Chapter 89, while HRS § 89-13(a)(8) proscribes wilful violation of the terms of a CBA.

Concerning the duty to negotiate, HRS § 89-9(a) requires public employers to

> negotiate in good faith with respect to wages, hours, the amounts of contributions by the State and respective counties to the Hawaii employer-union health benefits trust fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to collective bargaining and which are to be embodied in a written agreement as specified in section 89-10[.]

HRS § 89-9(c) states:

> Except as otherwise provided in this chapter, all matters affecting employee relations, including those that are, or may be, the subject of a rule adopted by the employer or any director, shall be subject to consultation with the exclusive representatives of the employees concerned.  The employer shall make every reasonable effort to consult with exclusive representatives and consider their input, along with the input of other affected parties, prior to effecting changes in any major policy affecting employee relations.

HRS § 89-9(d),[19] however, provides certain "management rights," which are intended to avoid interference through collective bargaining with certain employer's functions.  See, e.g., State of Haw. Org. of Police Officers ex rel. Rodrigues v. Cty. of Kauaʻi, 135 Hawaiʻi 456, 466, 353 P.3d 998, 1008 (2015). The management rights doctrine establishes that mandatory

---

[19]     We note that subsequent to the filing of the Complaint, HRS § 89-9(d) was amended to more specifically state that an employer may not invoke its management rights to preclude negotiations over "the implementation of management decisions that affect terms and conditions of employment that are subject to collective bargaining."  2018 Haw. Sess. Laws Act 10, Section § 1 at 37-38.

collective bargaining may not "interfere with the rights and obligations of the employer to," *inter alia*:

> (1)  Direct employees;
>
> (2)  Determine qualifications, standards for work, and the nature and contents of examinations;
>
> (3)  Hire, promote, transfer, assign, and retain employees in positions;
>
> . . . .
>
> (6)  Maintain efficiency and productivity, including maximizing the use of advanced technology, in government operations; [and]
>
> (7)  Determine methods, means, and personnel by which the employer's operations are to be conducted[.]

HRS § 89-9(d)(1)-(3) and (6)-(7).

Notwithstanding these management rights, it is well-settled that an employer may not make a change to wages, hours, or other terms and conditions of employment without first sitting down at the negotiating table.  See, e.g., Univ. of Haw. Prof'l Assembly v. Tomasu, 79 Hawaiʻi 154, 159-61, 900 P.2d 161, 166-68 (1995).  In any case, the charging party -- in this case HFFA -- has the burdens of proof and persuasion, both by a preponderance of the evidence, to establish the alleged violation of HRS § 89-9.  See HRS § 91-10(5) (2012); Hawaiʻi Administrative Rules (**HAR**) § 12-42-8(g)(16).

Our supreme court has explained:

> [HRS §§] 89-9(a), (c) and (d) must be considered in relationship to each other in determining the scope of bargaining.  For if Section 89-9(a) were considered disjunctively, on the one hand, all matters affecting the terms and conditions of employment would be referred to the bargaining table, regardless of employer rights.  On the other hand, Section 89-9(d), viewed in isolation, would preclude nearly every matter affecting terms and conditions of employment from the scope of bargaining. . . .

> Bearing in mind that the Legislature intended Chapter 89 to be a positive piece of legislation establishing guidelines for joint-decision making . . . we are of the opinion that *all matters affecting wages, hours and working conditions are negotiable and bargainable, subject only to the limitations set forth in Section 89-9(d)*.

United Pub. Workers, Local 646 v. Hanneman, 106 Hawaiʻi 359, 364, 105 P.3d 236, 241 (2005) (quoting Tomasu, 79 Hawaiʻi at 161, 900 P.2d at 168).  In that connection, the United States Supreme Court has held that the essential inquiry in determining the scope of mandatory collective bargaining -- ordinarily limited to "issues that settle an aspect of the relationship between the employer and employees" -- is whether an employer's action "vitally affects the 'terms and conditions' of [the bargaining unit's] employment."  Allied Chem. & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div., 404 U.S. 157, 178-79 (1971).

While the first thing to be considered in interpreting whether a term or condition of employment has been changed is the plain language of the CBA, "past interpretations and applications, and past practices, as part of the common law of the shop, may be considered."  See Gealon v. Keala, 60 Haw. 513, 521, 591 P.2d 621, 626 (1979) (citing, *inter alia*, United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578-79 (1960) ("The [CBA] states the rights and duties of the parties.  It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.")).

Here, the Board determined that the RIT training program was a "standard training" within the terms and conditions of the BU 11 CBA and that, to the extent that the program may have an impact on hours, HFD was exercising its management rights under HRS § 89-9(d)(1), (6), and (7).  Relying on Section 48-B of the CBA, which expressly contemplates "Employer-Required Training" and states that "time spent by Employees who are required by the Employer to attend training sessions on their days off shall be considered as time worked," the Board found that "HFD may require training as long as the fire fighters are compensated for working their days off.  There is no requirement for mutual consent or negotiation."  The Board thus concluded that HFD complied with its obligations under HRS Chapter 89 and the CBA in implementing the RIT training program.[20]

On appeal to this court, HFFA does not challenge the Board's interpretation of Section 48-B or any of the Board's FOFs, but rather invokes the unilateral change doctrine to argue that HFD "made multiple changes to [other] existing terms and conditions of employment without first giving notice and conferring in good faith with HFFA."  In particular, HFFA claims that the RIT program effected four unilateral changes to terms

---

[20]    Although the Board concluded that the training was not subject to mandatory bargaining, it found that HFD had a duty to consult with HFFA under Section 1.B of the CBA, which tracks HRS § 89-9(c) and mandates consultation over "all matters affecting employee relations."  The Board determined that HFFA treated the RIT training program as within the consultation requirement, not the negotiation requirement, and that "HFD did, in fact, initiate and fulfill its duty to consult."

and conditions of fire fighters' employment:  (1) requiring fire fighters to complete training consisting of "hazardous work assignments and 'search and rescue squad' type duties" without providing hazardous duty pay; (2) requiring fire fighters to attend training on their days off without first notifying and negotiating with HFFA; (3) requiring fire fighters to bring a meal to the training; and (4) requiring fire fighters to perform instructional duties without providing additional pay.  For the reasons that follow, we conclude that this argument is without merit.

Where, like here, there is a valid CBA in operation under HRS Chapter 89, an exclusive representative asserting a violation of an employer's duty to negotiate terms and conditions of employment must establish by a preponderance of the evidence that the employer's actions in fact changed said terms and/or exceeded the bounds of what the parties negotiated.  See Tomasu, 79 Hawaiʻi at 159, 900 P.2d at 166; see also HRS § 91-10(5); Malahoff v. Saito, 111 Hawaiʻi 168, 189-91, 140 P.3d 401, 422-24 (2006) (legislative act delaying payment of wages did not invoke "core subject of collective bargaining").

Upon conclusion of five days of hearings and submission of pre- and post-hearing briefs, along with myriad pleadings, declarations, exhibits, notices, and orders, the Board entered the following pertinent "Factual Conclusions" regarding the nature of the RIT program:  (1) "The RIT program is not

specialized training, but instead is standard training for OPS personnel;" (2) "[t]he purpose of the RIT Program is not to set different or additional minimum qualifications but to prepare HFD's personnel to save fire fighters who get into trouble;" (3) such training did not exceed the bounds of the CBA; (4) HFFA treated the training as a subject of consultation, not negotiation; (5) "HFFA failed to provide any factual basis for a finding that HFD violated the CBA;" (6) there was no showing of continuing worker safety issues or unreasonable risk of harm; and (7) "there was no evidence to show that HFD consciously, knowingly, and deliberately intended to violate the provisions of HRS Chapter 89 or the CBA."

The issue of whether the RIT program constituted such a material change in the terms and conditions of BU 11 fire fighters' employment as to give rise to a duty to bargain reflects a mixed question of fact and law, requiring application of legal standards to the factual conduct of the parties. See Del Monte I, 112 Hawai'i at 500, 146 P.3d at 1077 ("[w]hether a party failed to bargain in good faith is a mixed question of fact and law, as it consists of the application of the legal standard . . . to the factual conduct of the parties" (citing, *inter alia*, Price v. Zoning Bd. of Appeals, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994) (defining mixed questions of law and fact as conclusions of law that are "dependent upon the facts and circumstances of the particular case"))); see also Del Monte II,

128 Hawaiʻi at 302, 287 P.3d at 203 ("a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made").  Thus, the Circuit Court applied the correct standard of review in determining whether the challenged findings were supported by substantial evidence and we apply the same standard here.

    1.   *Safety and Hazard Pay*

    HFFA contends first that "the training exercises involved hazardous work assignments and 'search and rescue squad' type duties" which (1) affected fire fighters' health and safety, and (2) necessitated a pay increase per Section 44-D of the CBA, governing pay for Hazardous Duty.[21]  This argument falls flat.

    While there is no dispute that worker safety is a term and/or condition of employment, as the Board's unchallenged FOF 3(a) states:  "[f]ighting fires is an inherently dangerous activity, and fire fighters must be properly trained in their jobs to minimize, as much as possible, loss of life or serious

---

    [21]    Section 44-D provides, in relevant part:

        Employees assigned to units that are designated for search and rescue responses which require them to be trained and/or certified beyond that which is required for other members of their class (and such is not recognized in the pricing of their class), shall be paid a hazardous assignment differential of 8.126% of the Employee's regular salary in addition to base pay and applicable differentials and premiums.

injury."  As such, the Board further found in FOF 3(b), and HFFA does not contest, that fire fighter training is a "continuous effort" for HFD and a "crucial function to reduce line-of-duty deaths and injuries."  HFFA also raises no argument against the Board's determinations that RIT training was "crucial . . . for safety purposes" and that "any time a company is dispatched to a fire, there is a potential that a fire fighter could be designated as part of a [RIT] . . .  Thus, the necessity [is] to train all [OPS] personnel in [RIT] techniques."[22]  To be sure, the fact that the training was mandatory for all OPS personnel, as opposed to designated search and rescue personnel *trained beyond the standard for others of their class*, supports the Board's finding that it was not specialized, and cuts against HFFA's assertion that the Hazardous Pay provision of the CBA applied.[23]

Although the Board found that the RIT training program was HFD's first training course specifically geared to RITs, it determined that the training effectively implemented an *existing HFD policy* stating that "[an] RIT shall be established at every confirmed building fire and for any other incident where an extreme life safety hazard exists for responding fire fighters." As Chief Neves testified, RITs had been a part of HFD policy for

---

[22]    HFFA's safety committee representative, Captain Reppuhn, testified: "RIT training is an excellent idea" and addressed a "real situation on the fireground that [fire fighters] need to be able to handle."

[23]    HFFA President Lee testified on direct examination that hazardous pay was "[p]robably not" a concern for RIT training.

at least 10 to 15 years, thus its adoption predated the CBA in effect at the time of this particular training program's implementation.

The Board concluded, and HFFA does not contest, that the training's intensity reflects the serious and occasionally dangerous nature of fire fighting generally, as well as the need to prepare fire fighters for those situations.

Furthermore, the Board found, and HFFA does not challenge, that fire fighters could elect to observe the physical portions of the training and that these "observers" would still receive a certificate of completion.  The Board determined that although some injuries were recorded, HFD satisfactorily addressed the concerns raised in the HIOSH Complaint, the closure of which HFFA did not appeal, and that there were no reports of serious injury.  The Board thus concluded that there were "no worker safety issues extant" at the facility where RIT training took place and there was no showing that OPS personnel would be subject to any unreasonable risk of harm.

In light of the substantial evidence in the record supporting the Board's findings regarding the nature of fire fighter safety and training generally, and specifically as concerning the RIT program, we conclude that the Board did not clearly err in determining that HFFA failed to establish that OPS personnel were subject to any unreasonable risk of harm which

affected the terms and conditions of their employment and which would have necessitated bargaining and/or hazard pay.

2.   *Hours*

HFFA next contends that RIT training violated the Hours of Work provision of the CBA by requiring fire fighters to attend training on their off days.[24]  This argument is without merit.

As noted above, Section 48-B of the CBA, "Employer-Required Training," expressly contemplates that HFD may require training on employees days off and states that "time spent by Employees who are required by the Employer to attend training sessions on their days off shall be considered as time worked." In addition, Section 21-A of CBA, concerning overtime work, provides:  "Overtime work will occur when an Employee performs service at the direction of or as scheduled by proper authority (including while attending training sessions required by the employer)," and includes work "1. in excess of the normal scheduled work hours on a day or shift; [and] 2. on the Employee's scheduled day or shift off and there has been no permanent change in the Employee's work schedule."  Here, there is no evidence that the RIT training program constitutes a permanent change in schedule, or that HFD does not have authority

---

[24]    Section 20 of the CBA, concerning Hours of Work, states:

In the event the fire chief (employer) desires to change a work schedule, the fire chief (employer) shall notify the union (30) days prior to the tentative implementation date of the anticipated change in order to afford the union an opportunity to negotiate with the employer with reference to said change.

to direct fire fighters to work overtime as contemplated in Section 21-A.

To the contrary, the Board found and the record supports that HFD followed an established method in implementing the RIT program.  Like the FGS training which preceded it, RIT training was mandatory, requiring a "certificate of completion," and included a rigorous field training course which involved overtime scheduling and permitted fire fighters a choice of three 2-day periods, spread over several months, on which to complete the training.  HFFA did not complain or demand negotiation regarding the FGS training and on appeal does not challenge the Board's finding that HFD followed the FGS model in implementing RIT training.

HFFA thus has not met its "heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences."  Konno, 85 Hawaiʻi at 77, 937 P.2d at 413.  Therefore, we conclude that the Board did not clearly err in determining that the practice of requiring fire fighters to complete training on days off did not affect their hours, and therefore, that practice was not subject to mandatory bargaining under HRS § 89-9(a), especially in light of the fact that off-duty training is expressly allowed in the CBA.

3.   *Meals*

HFFA argues that under CBA Section 30-A, employees working beyond their normal shift are entitled to "a meal after

two hours."  In pertinent part, Section 30-A provides:  "When required to work beyond the normal work shift with less than one work shift prior notice, an Employee shall be entitled to a meal after the first two (2) hours and an additional meal at the end of each five (5) hours of continuous work thereafter."  Special Notice SN-16-044 was issued on March 1, 2016, and informed fire fighters that they were to schedule their training session by March 21, 2016, with mandatory training to begin April 4, 2016. HFFA produced no evidence that two weeks' notice did not meet the "one work shift" condition for requiring BU 11 employees to bring a meal for training scheduled during off days.  This argument is without merit.

       4.  *Trainer Wages*

Finally, HFFA contends that the 33 RIT trainers "did not receive additional pay or compensation for their added duties."  The issue of trainer wages was not raised before the Board, hence the issue is waived.  See HRS § 89-14 (2012) (providing that the Board has exclusive original jurisdiction over any controversy concerning prohibited practices); HAR § 12-42-42(a) & (f) (prohibited practice complaint must be filed within 90 days of the alleged violation; only one complaint shall issue arising from a single controversy);[25] see also Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4)(iii) (appellant shall

---

[25]    Although a complaint may be amended in the discretion of the Board prior to the issuance of a final order thereon, pursuant to HAR § 12-42-43, the Complaint herein was not amended to allege trainer wages.

state "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency" or the point will be disregarded); <u>Waikiki Resort Hotel, Inc. v. City & Cty. of Honolulu</u>, 63 Haw. 222, 250, 624 P.2d 1353, 1372 (1981) ("the general rule that an appellate court will consider only such questions as were raised and reserved in the lower court applies on review by courts of administrative determinations so as to preclude from consideration questions or issues which were not raised in administrative proceedings.").

  C. <u>Circumvention and Direct Dealing</u>

   Lastly, the Union contends that the Circuit Court was wrong to affirm Decision 482 because HFD violated HRS § 89-13(a)(1) and (7)[26] by circumventing HFFA as the exclusive bargaining representative of fire fighters and engaging in direct dealing with employees.  HFFA argues on appeal that the solicitation of fire fighters to serve as instructors for the RIT training program and to participate in the RIT working group interfered, restrained, and/or coerced employees in their exercise of the right to collective bargaining.

---

[26] HRS § 89-13(a)(1) makes it a prohibited practice to wilfully "[i]nterfere, restrain, or coerce any employee in the exercise of any right guaranteed under [HRS Chapter 89]" and HRS § 89-13(a)(7) generally prohibits wilful refusal or failure to comply with Chapter 89.

First, HFFA's argument that the solicitation of fire fighters to serve as instructors for the RIT program constituted circumvention and/or direct dealing was not raised in the Complaint filed with the Board.[27]  Instead, the Complaint alleged that the City failed to properly consult and/or negotiate with the Union when it issued Special Notice SN-16-044, which gave notice of the RIT training program, and that the implementation of the mandatory RIT training without proper consultation constituted prohibited practices.  There were no allegations before the Board of circumvention or direct dealing concerning the solicitation of instructors.  Thus, this argument was waived. See HRS § 89-14; HAR §§ 12-42-42 & 12-42-43; see also HRAP Rule 28(b)(4); Waikiki Resort Hotel, Inc., 63 Haw. at 250, 624 P.2d at 1372 (1981).

Similarly, HFFA did not allege in the Complaint that HFD engaged in unlawful circumvention of the Union or direct dealing with employees when it asked *the Union*, in the first instance at a monthly meeting between HFD and HFFA, to participate in a working group to look at, *inter alia*, the curriculum, schedule, equipment, and safety measures for the RIT training program.  Indeed, there was no allegation of

_____

[27]     As the City pointed out in its answering briefs in both the primary appeal and this secondary appeal, this issue was raised by HFFA for the first time on appeal to the Circuit Court.  HFFA does not point to where in the record any allegation of direct dealing or circumvention of the Union was made.  We reject HFFA's assertion that the allegations in the Complaint, none of which assert direct dealing or circumvention of the Union, adequately provided notice to the City or raised such issues for determination by the HLRB.

circumvention of the Union or direct dealing with employees as to the RIT working group.  While HFFA later pointed to HFD's request that the Union participate in the RIT working group, it did so in support of its argument that HFD failed to properly negotiate and/or consult with the Union concerning the RIT training program.  Thus, we conclude that the argument that HFD circumvented the Union and/or engaged in direct dealings with employees was not raised before the Board and this argument is waived.

V.   CONCLUSION

          For these reasons, we conclude that the Circuit Court was not wrong to affirm Decision 482.  The Circuit Court's November 7, 2017 Judgment is affirmed.

          DATED: Honolulu, Hawaiʻi, August 31, 2021.

On the briefs:

Herbert R. Takahashi,
Rebecca L. Covert,
(Takahashi and Covert),
for Complainant-Appellant-
 Appellant.

Amanda Furman,
Ernest H. Nomura,
Gabriele V. Provenza,
Deputies Corporation Counsel,
City and County of Honolulu,
for Respondents-Appellees-
 Appellees.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Karen T. Nakasone
Associate Judge